Our second case this morning is number 23-1506, Bitmanagement Software v. United States. Mr. Fleming. Good morning and may it please the Court, Mark Fleming together with Brent Gurney on behalf of Bitmanagement. The Court of Federal Claims recognized that in what it called the usual copyright case, damages would compensate for the unrestricted, unmonitored copies of Bitmanagement Software that the Navy installed. That, after all, is what the Navy took. But the Court erroneously believed that footnote 5 of this Court's prior opinion foreclosed that approach in this case and this case only. That was legal error and I don't read the government's brief as defending it. The problem with the resulting judgment is that it doesn't do what this Court in the Gaylord cases said is required, namely paying fair market value for what the defendant took. So what case says that as part of copyright damages you have to be paid for each copy? Well, no case says that for all cases, but that's not our burden to show and we're not arguing that it has to be in all cases. The rule is, as this Court stated in Gaylord, Gaylord 3, that copyright damages have to pay fair market value for what the defendant took. And so in this case, the question is what kind of a license would have given fair market value for the scope of the copying that the Navy did? And let's remember. The question is what would the result of a hypothetical negotiation be? Correct. And since the license agreement was a floating license to be determined by this Flexera software, why isn't it followed that that's this approach that the parties would have taken in a hypothetical negotiation? Well, because at the hypothetical negotiation, Judge Dyke, the parties would have known that the Navy either wouldn't or couldn't use the Flexera software. That's what this Court found was the fact of the infringement and the reason why all of the installed copies were infringing acts. So the question of the hypothetical negotiation would have been what would the parties have negotiated in order to give the Navy installed copies on all 400,000 of its computers with no monitoring, no restriction, and no limit of use? And the only license that would give that is a PC license for all those computers. It doesn't mean we get the full list price and we haven't asked for that. So in the original briefing, which I went back and looked at to refresh my recollection about, it is quite clear that the parties are arguing about whether you were entitled to be compensated for each copy or based on a floating license. That was the heart of one aspect of the briefing. So I'm having difficulty in understanding, given that focus of the briefing the first time around, how it is that footnote five is dictum. Footnote five certainly is dictum. There was no damages ruling. You're not answering my question. I was argued the first time around. You were arguing that you were entitled to be compensated on a per-copy basis, right? Well, certainly. But that was the basis of our claim. It always has been. But the Court of Federal Claims didn't decide damages the last time because it found that there was no liability. This Court addressed liability, but there was no argument at the oral argument before this Court, and there was no basis to decide what the basis, the royalty base for the damages were going to be. That was something that was remanded for the Court of Federal Claims to do a calculation of damages. So even if the parties argued whether you were entitled to be compensated on a per-copy basis because the Court of Federal Claims hadn't addressed that issue, it was dictum? That's your theory? No. It certainly was not essential to the ruling of this Court the last time around. And even if I'm wrong about that, Your Honor, the notion that this Court would have created a circuit split with the Thoroughbred case, with the Deltac case from the Seventh Circuit that the government likes to rely on, with this Court's own Gaylord cases, which talk about fair market value for what the infringer took, it would not have happened. What's the circuit split? In the Thoroughbred case from the Sixth Circuit, the defendant argued that there should be no damages awarded for copies of software that it claimed it only made for convenience and didn't use. The Sixth Circuit reversed the district court for not awarding damages for those copies and awarded damages for those copies. In the Seventh Circuit, in the Deltac case, the Court made very clear that the value of use for a copyrighted invention is the value of what the infringer took from the copyright holder, namely, the value of a license fee for what was taken. And that's what we're talking about here. I don't read those cases as establishing a rule, a general rule in that respect. One of the cases seems to be not dealing with this issue at all, but with a fair use question. And the other case is dealing with a situation in which the agreement between the parties contemplated compensation on a per-copy basis. The fair use case, I think, is the Wall Data case, which is separate. I can explain why I think that's relevant. But Thoroughbred Software most certainly did award damages and reversed the district court for not awarding damages on copies of software that the defendant claimed had not been employed. The additional point, and I think this is a point of principle— Did the Thoroughbred case involve something where previously there had been a floating license between the parties? Well, there had been—I don't think there was a floating license, but here also the term of the floating license that this court found was infringed or was violated was the using of Flexera. And the question is, at the hypothetical negotiation, where the parties know that Flexera is not going to work and not going to be used, what is the resulting license that would have given fair market value for what the Navy actually had? And let's remember, it's not disputed that the Navy got value far and away beyond the actual number of instances of SPDRS-3D that were logged into according to the Navy logs. This was admitted by their expert, Mr. Kennedy, on cross-examination, but he gave no value to it. He called it a convenience factor. The Court of Federal Claims likewise said it was a convenience factor. Why does it follow that if the parties in the hypothetical negotiation knew that the Flexera software would work, that they would change the principle of compensation from a floating license to a per-copy? Well, there are a number of reasons for this, Judge Dyke. So first and foremost, that is how Bit Management and the Navy had always handled every sale of BS Contact Geo that was not going to be monitored by Flexera. The only time they envisioned the use of a floating license was when Flexera was going to monitor and limit the use of the software to make sure the Navy did not exceed the number of licenses that it had. If the parties had known that that wouldn't work, what other option did they have in order to provide fair compensation for what the Navy took, which was unrestricted, unmonitored, widely available? Well, the option is the one that the Court of Federal Claims followed, which is to figure out how many floating licenses would be required. Well, so there is no example in the record of any deal that Bit Management ever signed with the Navy or anywhere else that followed that mechanism, and Bit Management would not have. In fact, this Court in its previous decision said it would have been objectively unreasonable for Bit Management to authorize copying on such a vast scale without any kind of limitation, simply on the basis that, you know, you can trust us and our imperfect logs that will, after the fact, not even track the use of BS Contact Geo, but only the use of SPDRS-3D, even though there are, by admission of the Navy in their interrogatory responses, multiple other repositories of 3D information that would have been viewed using BS Contact Geo. Those weren't even purported to be tracked, and also no tracking even of the first year of SPDRS-3D. So that is our alternative argument as to even if you believe that actual accessing of the software is important, the Navy failed to carry its burden, and it most certainly was its burden, to show that there were any, that there was any use within the license agreement. It was the Navy's burden because we said that in Footnote 5. No, not just that, Your Honor. I mean, it's truly said. You do say that that's part of the mandate, right? Well, no. It's part of Footnote 5. The mandate was that the Court reconsider the calculation of damages. We're very clear, I think, that the Court of Federal Claims was bound by that statement in Footnote 5. Bound because it's an accurate statement of precedent, Your Honor. Again, the Delta Act case that the government relies on says that any risk of, or that the burden of showing that the cost of the copyrighted product is anything less than the list price lies with the defendant. And that's particularly in a case like this, where the uncertainty is due to the defendant's own failure to keep records, and specifically the records that the party's agreement envisioned they would keep. And that that's the reason for the ultimate infringement is that the Navy didn't track using Flexera as the Court found was the condition of the implied license. So if there was ever a case in which the burden of proof should be on the defendant, I don't have to argue that Footnote 5 is a mandate. Footnote 5 is correct as a matter of the law, that the burden of uncertainty has to fall on the infringer, particularly where the uncertainty results from the failure of the infringer to keep correct records. You've said several times that at the hypothetical negotiation, the parties would know that Flexera either wouldn't work or that the Navy would somehow fail to use it. Where is that coming from? Why would that be part of what they would know, as opposed to the hypothetical license here should be one in which a willing buyer and a willing seller agree to terms, which would have included something like Flexera to monitor the usage? Well, the hypothetical negotiation always envisions that the parties know that the defendant is going to infringe. Otherwise, if the parties didn't know that, what are they negotiating over? They're negotiating over what the defendant is actually going to take in the but-for world where they had actually known that the infringement was going to happen. I mean, that's what Mr. Gaylord did, right? I mean, Mr. Gaylord didn't know at the time of a hypothetical negotiation that the government was going to take the image of the sculpture and put it on a stamp. But the hypothetical negotiation was set on the assumption that the parties knew that that's what was going to happen. And the question is, what kind of license would have given Mr. Gaylord fair market value? Is that the theory that your expert articulated and that you argued to the Court of Federal Claims? We certainly did this. That was the basis of this. We said because the government took 400,000 copies unlicensed, he started with what he thought was the right starting point for per-copy license. He gave a significant volume discount. But does your expert say, and the parties would know hypothetically at the negotiation that Flexera would not work or would not be used? I think that, I don't recall whether he says that specifically, but I think the point is that at every hypothetical negotiation, it is assumed that the parties know what the defendant is going to do that results in an infringement. This is true in patent cases as well as copyright cases. And that ultimately, they're bargaining over what it was that the Navy took. And that's what this Court said in Gaylord 2 and Gaylord 3, that that's the purpose of the hypothetical negotiation is to provide fair market value of a license that covers what the copyrighted work that the defendant took. Otherwise, there would never be a hypothetical negotiation resulting in a license because the defendant could always say, well, the plaintiff wouldn't have known back then that we were going to infringe. The whole point of the hypothetical negotiation is they are negotiating over a license that covers the infringement. All the cases say that. Can I ask you about a different issue? Of course, there's some. There's an argument about the use of Contact Geo outside of Spiders 3D. Is there a quantification of that anywhere? No, there can't be a quantification because again, the Navy failed to do what this Court found was a condition of the implied license. They didn't even try to try. Was there a concurring discovery for damages? Did anyone try to figure out what this amount was? I believe the Navy conceded that it did not even purport to track that. I believe that... Was there any attempt to seek that discovery? The thing that I find odd is that I have a concern that perhaps you were deciding that the better way to approach this would be to say we want a per-copy license and not a per-use license. This, which might have been small potatoes, was just set aside during discoveries, maybe not being a theory worth pursuing. I'm trying to figure out what efforts were made to try to determine this as a potential damages theory. I believe that the government, and I want to make sure I'm correct before I say it, so if you'll forgive me to find the exact page. I'll give it to you if it does, in fact, say what I believe it does. If one looks at page 10,087, 1-0-0-8-7 of the appendix, this is in the second volume. This is the government's response to our second set of interrogatories. If the Court is with me, if you look at the paragraph that has 1 in brackets there, it says, B.S. Contact Geo licenses were procured to support viewing of X3D files used in the context of SPDRS-3D. The Navy has not tracked whether Navy personnel have used B.S. Contact Geo to view X3D files outside the context of SPDRS-3D and thus cannot identify whether such use has occurred or each such use. I don't know what more we could have asked after we got that response. With the Court's permission, I reserve the balance of my time. Okay, we'll give you two minutes. Thank you, Your Honor. Mr. Bolden? Good morning, and may it please the Court. The Court of Federal Claims correctly awarded a hypothetical license based directly on the party's actual licensing practices for the software at issue. Bit management's relevant arms-length transactions, licenses, and offers focused on the number of users of the software and not the raw number of copies. The trial court found, and Bit Management does not contest, that Bit Management's website licenses allowed unlimited downloads and unlimited installations without restriction. Bit Management offered website licenses with unlimited downloads to the Navy, or at least it was considered in the context of the Navy's EarthClobe project. There, Bit Management considered a B.S. Contact Geo domain license with unlimited downloads. They offered it to a foreign capital city for an unrestricted number of citizens and users. The price for that was a single lump sum royalty of 45,000 Euros, far less than what the Court of Federal Claims awarded here. They also considered a similar license for a foreign regional state that was described as unlimited in time and number of users. That was 11,000 Euros, roughly seven times less than what the Court of Federal Claims awarded here. The key point is that the fair market value for these licenses and quotes was driven by the number of users, not the number of copies. The right to make unlimited copies was essentially a selling point by Bit Management. It was baked into the royalty and captured by the per-use royalty. There is no authority in this court that mandates a per-copy royalty in all cases of copyright infringement. This court did not mandate and could not have mandated that in the prior appeal. There is no circuit split. What the cases hold is that the royalty must be kept and must match the evidence. That's what Gaylord holds. That's what Ondavis holds. That's what the Court of Federal Claims holds in this particular case. Talking about Gaylord, Gaylord directly rejects the premise of an automatic one size fits all royalty in all cases. The Gaylord cases illustrate that the hypothetical license should account for how the government used the work at issue and what kind of royalty best matches that use. How do you respond to the argument that during the hypothetical negotiation the parties would know that Flexera wouldn't operate and therefore Bit Management contends that it would not have agreed to a usage agreement? Your Honor, the way that the parties would have encountered that is counsel is correct that the parties would have been aware that there would be infringement or that they were negotiating for royalty to cover the Navy's uses. The Flexera issue is simply a technical issue that resulted in the infringement. In determining the fair market value for a license to cover that infringement, the parties are going to be looking at those benchmark licenses that I mentioned and Bit Management's website licenses. They're going to know that Bit Management has actually extended those kinds of licenses for exactly the kind of use that the Navy made of the software. Just to be clear, you're agreeing with your friend on the other side that at the hypothetical negotiation time, the parties would know that even though part of the deal was supposed to be the Navy would use Flexera to limit, as I understand it, the number of simultaneous users, that that would not happen and you would have something on the order of 400,000 or 500,000 copies and you'd agree to compensate them fairly for that. That's correct, Your Honor. In fact, that's what the parties actually did between 2006 and 2013 as illustrated in the first appeal. What's your theory is that in the hypothetical negotiation, even though the parties knew that Flexera wouldn't work, they would not have departed from the principle of a floating license to go to a per copy license instead. That's correct, Your Honor. Flexera was initially proposed in 2011 or 2012 in response to Bit Management's offer of three different options for tracking how the software was going to be used. By used, it was specifically focused on the number of copies of software that were actually running at the same time. The overall intent of the parties from 2006 through 2013 was to go to a use-based license approach. The parties did go to a use-based license approach. Yes, the technicalities did not work, but in retrospect, we have evidence that the Navy actually did not use the software more than 38 times during that time period. In your view, how does the hypothetical license that the Court of Federal Claims found here, how does it account for all of the many hundreds of thousands of copies that were made and for the convenience that the Navy gained from making all those copies? How is that accounted for in this license? Your Honor, the Court of Federal Claims specifically acknowledged the convenience aspect of things in footnote 17 of its opinion, where it said the convenience factor is appealing to the  It suggests it could be worth $10 a copy, I think. Your Honor, you have to remember that the proper construct here is you have to look at what the fair market value is. If you look at Visauna, if you look at Law & Davis, the focus is always on what the owner has lost, not what the taker has gained. Yes, they can point to the fact that the government perhaps did value the convenience, but that convenience value was completely baked in to the per-use model that management had and advertised to others where it said, you can use unlimited copies or unlimited downloads as long as you pay us for what you use. That's how we price our licenses. I mentioned the On Davis decision. On Davis is a perfect illustration that this isn't just the rule in the context of Title 28 with cases against the government. It's true of all copyright cases that encounter the issue of actual damages. On Davis, the plaintiffs there wanted $2.5 million based on per copies and per viewers, essentially. The court, the plaintiff, that's speculative. That's not going to work, but the plaintiff in that case had produced evidence of a lump sum $50 royalty for a possibly comparable license and remanded on that particular basis. The point is that the plaintiff has to come up with objective, reliable, comparable evidence that supports the royalty that they demand. Here, the management did not do that. Do you agree that in the original appeal that the briefing focused on whether they were compensated on a per-copy basis or on a floating license basis? I do not agree. The first appeal was completely focused on liability. I can quote you from the briefs where the parties argued about that. In the first appeal? Yes. Have you looked back at the first appeal? I've looked at the first appeal decision. I have not reviewed the briefs in quite some time. You might need to look back at the briefs because that was the central argument that both sides were addressing. I do recall that there was a citation to how BIT Management had originally argued in its complaint that it was entitled to $596 million based on... Both parties argued about the question of whether per-copy compensation should result or not. Take a look at it. Yes, I take your representation, Your Honor. My sense is that throughout the case, BIT Management has argued that it's entitled to a per-copy royalty. In fact, it suggested and argued to the Court of Federal Claims that it was entitled to a per-copy royalty because it was controlling law. The Court of Federal Claims originally bought into that argument that it was controlling law, that BIT Management was entitled to a per-copy royalty. How does the damages that was awarded account for the potential use of ContactEO outside of FIDR's 2D? Your Honor, there was no use or no objective evidence of use of the software outside of the context of FIDR's 3D. We had three different... Didn't the government admit that there may have been use? It's possible that there could have been use, but it's not something that the Navy actually purchased BS ContactEO for. We have three different Navy witnesses who testified at trial that they were aware of no other use of BS ContactEO outside of the context of FIDR's 3D. FIDR's 3D was the driving force for the Navy to negotiate licenses for BS ContactEO. We have one of the witnesses who maintained those repositories that opposing counsel referenced. Just a reminder, did the judge below address this factual issue? He addressed it only in the context of his finding that there was no other need for the Navy for BS ContactEO. That's supported by the record. The record shows three different witnesses testifying that there was no need for BS ContactEO. The record shows that before BS ContactEO, there were perhaps at most five users Navy wide who might have been interested in this kind of technology. The repositories were down for several months, and no one complained that the repositories were down. Even stepping outside the context of the Navy, if you look at the record, as far as what bit management was able to sell at that particular time, or even the downloads of its free version that made from its website, all of that was falling. The overall objective evidence shows that there really was not much interest in bit management software. There's certainly no evidence of that interest in bit management software within the Navy other than BS ContactEO. Since you don't think evidently that the Court of Federal Claims had to follow footnote five, do we have to decide now, I guess again, who had the burden on determining or proving the amount of use? You're correct. The government contends that footnote five is not controlling. You do not have to reach who controls the burden, because no matter who has the burden, if one party brings objective evidence to trial, and the other party brings speculation, then the party who brings objective evidence to trial is going to prevail, no matter what the burden is. You're saying you brought the objective evidence, right? That's correct. They say, though, that was a failing on the government's part, because you admitted, and we saw in the interrogatory, you admitted there was a whole bunch of evidence that you couldn't produce going to actual usage. Shouldn't that have led the trial court to draw an adverse inference against the government? No, Your Honor. There was no argument about spoliation. There's really no room for misconduct or wrongful activity in the context of a 1498 case. If you look at Lisona, if you look at Gaylord II, both of those say that this is an imminent domain context, where the government does not act wrongfully, it acts lawfully when it takes a license in patents in Lisona, or in copyrights under Gaylord, and then pays a spare market value for it. In this particular context, we offered the best evidence possible as to the government's use of BS Contact Geo during the time period of infringement. The one area where you didn't was an area where you had witnesses testify that there would have been no need for that particular technology. That's correct, Your Honor. The evidence we offered were the Spyder's 3D logs, and the Spyder's 3D logs were complete. The Court of Federal Claims found them to be reliable evidence. They were complete within the last two years of the infringement, and the Court of Federal Claims used an estimate for the first year of infringement, completely within his discretion. A bit management also argues that the Court of Federal Claims concluded that footnote five required it to deviate from the damages rules that would apply in the usual copyright case. Do you agree that that's what the Court of Federal Claims saw in our footnote five? I'm not sure what the Court of Federal Claims saw in footnote five. I think the Court of Federal Claims was certainly confused by footnote five. As far as this concept of the usual copyright case, that is something that bit management has argued since even before the first trial, that the usual copyright case essentially requires a per-copy approach. When the Court of Federal Claims initially excluded the government's damages expert, the Court of Federal Claims appears to have bought into that theory, that the usual copyright case requires a per-copy award. That's not true. As noted, I've already discussed on Davis. There's the Bruce case from the First Circuit. There are plenty of cases under Title 17 that do not require a per-copy award. In fact, the overall rule is that the royalty has to best match the evidence. That's exactly what happened here. If there are no further questions, Your Honor, we ask that the Court of Federal Claims be affirmed. Thank you. Thank you. Mr. Fleming, you have two minutes. Thank you, Your Honor. On the website licenses, Mr. Bolden was very clear that he was talking about website licenses. They do not cover what the Navy took because they simply allow for users who are accessing a single website to view content on that website, whether it is a city map or something from a particular jurisdiction, and view only that material. They do not allow all employees of the entity to view material not just of the entity but out on the public internet or any other repository. All the examples that he spoke about were website licenses. That is not what the Navy took. It's not what the Navy wanted from bid management. The right to make unlimited copies would never have been given without Flexera. That's what this Court said in the prior case, and I'll read it specifically so that there's no question about it. Flexera would function by limiting from the time of copying the number of simultaneous uses of the program. This condition rendered reasonable the otherwise objectively unreasonable decision of bid management to allow the Navy to make unlimited copies of its commercial product. Without Flexera tracking it, there would never have been a floating license arrangement where the Navy could have used the software throughout its system without monitoring, without tracking, without restriction. It would have been objectively unreasonable to do so. Is there any evidence that the Navy would have agreed to pay for each copy? Well, because that is the only license that would have given them what they needed. They specifically wanted to have it everywhere. They didn't want to have to call bid management. They would have a floating license with another mechanism for computing usage. There's no evidence of anything like that. That's the point. Nothing like that that would have given them what they wanted. A website license wouldn't have done it. An OEM license wouldn't have done it. The only license structure that gave them what they wanted and what they wound up taking, which was... I don't think you're responding to my question. Why is it that the most reasonable conclusion is that having agreed to a floating license and finding that the mechanism for monitoring usage didn't work, that they would have adopted some other mechanism for computing usage? Well, the question of the hypothetical negotiation is not would the Navy have rather not infringed. Of course the Navy would rather not have infringed. Every infringement was fought. I don't think you're responding to my question. But there is... The point, Judge Dike, is we put in evidence that but for Flexera, bid management would never have agreed to a floating license scheme. The court's prior opinion supports that. And so what we have left is a PC license structure. There is no evidence in the record at all of any license agreement with anybody that approximates what the Court of Federal Claims imposed on bid management here, which is widespread copying without any control. That is exactly not what bid management would have agreed to. I'd like to turn to... I think we're out of time. Very well. Thank you. Thank both counsel and cases. Thank you very much.